UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,   :
             :
    v.        :   **MEMORANDUM & ORDER**
             :   19-CR-004-1 (WFK)
RONELL WATSON,     :
             :
       Defendant.  :
-------------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge:**

Ronell Watson ("Defendant") was found guilty following a jury trial of (1) Attempted Murder of a Federal Officer in violation of 18 U.S.C. § 1114(3); (2) Assault of a Federal Officer in violation of 18 U.S.C. §§ 111(a)(1) and 111(b); and (3) Possessing and Discharging a Firearm During a Crime of Violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(A)(iii). The Court now sentences him and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is sentenced to 382 months of imprisonment followed by three (3) years of supervised release.

## BACKGROUND

The Government filed a criminal complaint against Ronell Watson ("Defendant") and Molissa Gangapersad on December 10, 2018, and a superseding four-count indictment on January 3, 2019. Presentence Investigation Report ("PSR") at 1, ECF No. 157; Complaint (Compl.), ECF No. 1. The superseding indictment charged Defendant Watson with: (1) Attempted Murder of a Federal Officer in violation of 18 U.S.C. § 1114(3); (2) Assault of a Federal Officer in violation of 18 U.S.C. §§ 111(a)(1) and 111(b); and (3) Possessing and Discharging a Firearm During a Crime of Violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(A)(iii). PSR ¶ 1–3. Defendant Watson was not named in the fourth count. *Id.* ¶ 4. The superseding indictment alleges Defendant Watson knowingly and intentionally attempted to kill a Special Agent of the Federal Bureau of Investigation. Indictment ("Ind.") at 1, ECF No. 11. On July 17, 2019, a jury found Defendant guilty of Counts One through Three. PSR ¶ 1. Defendant Watson has been in custody since his arrest. *Id.* ¶ 82. The Court hereby sentences

Defendant Watson and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

### I.      Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case.  The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form[.]"  *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)."  *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).  Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant.  The Court addresses each in turn.

### II.     Analysis

### A.  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

    a.   Family and Personal Background

Defendant was born Ronell Adrian Watson on September 12, 1987, in Georgetown, Guyana.  PSR ¶ 49.  Defendant is the only child born to the marital union of Ronald Watson and Theresa (née) Ford.  *Id*.  Defendant's father died in 1989.  *Id*.  Defendant's mother (age 61), with whom he has a close relationship, is a retired schoolteacher.  *Id*.  She is aware of the instant offense and is supportive of Defendant.  *Id* ¶ 50.  Defendant's mother has been married to Godfrey Frasier (age 68), a retired construction worker, since the Defendant's childhood.  *Id.* ¶ 56.  Defendant noted he has always maintained a good relationship with Mr. Frasier.  *Id*. Defendant has three maternal half-siblings, all of whom live in New York State.  *Id.* ¶ 51.  The siblings are aware of Defendant's arrest and conviction, and they remain supportive of him.  *Id*.

According to the U.S. Immigration and Customs Enforcement ("ICE") database, Defendant entered the United States on August 23, 1996, is legally residing in the United States as a permanent resident, and is amenable to removal proceedings for the instant conviction.  *Id*. ¶ 55.  Defendant stated, and his mother confirmed, that he is a derivative United States citizen through his mother, and he has a United States passport.  *Id*.  However, Probation notes Defendant has not provided any proof or other documentation to indicate ICE records are incorrect.  Second Addendum to the PSR ("PSR Add. 2") at 3, ECF No. 180.

Defendant's mother raised him in Georgetown, Guyana, until she immigrated to the United States when he was three.  *Id*. ¶ 52.  Defendant was left in the care of his maternal

grandmother, Shirley Edwards (age 80). *Id.* Although the neighborhood Defendant resided in during his childhood was "very poor," their family was middle-income. *Id.* ¶ 53.

Defendant experienced troubling incidents in his youth. He reported to probation he was physically and sexually "abused by an older cousin," who would also occasionally lock Defendant "in a cage they used for dogs." *Id.* ¶ 54. At age eight, Defendant witnessed "unknown individuals" "slaughter" this cousin "with a machete." *Id.* Furthermore, because of his grandmother's political affiliations, the family often needed army protection during political elections. *Id.* ¶ 53. Defendant reported that when he was four, an unknown group threw a Molotov cocktail through their home window. *Id.*

Defendant also experienced difficulties after moving to the United States. Defendant reports he was bullied at school and assaulted by classmates. *Id.* ¶ 58. Several boys stole his bicycle and assaulted him in front of his home. *Id.* He also witnessed shootings and robberies in his neighborhood. Def.'s Sentencing Mem & Objs. to PSR ("Def. Mem.") at 5, ECF No. 174. Defendant reports that when he was thirteen, a close friend of his died after being stabbed in the neck. *Id.* at 6.

Defendant has been romantically involved with Molissa Gangapersad (age 31), a nurse coordinator, since 2009. PSR ¶ 59. Defendant reports their relationship has remained intact since his instant arrest and conviction. *Id.* However, because Ms. Gangapersad is a co-defendant in the instant offense, she has had no contact with Defendant as part of her bond conditions. *Id.* ¶ 60. Defendant and Ms. Gangapersad have one child, Malia Watson (age 9). Ms. Gangapersad and Defendant's family members financially support the child, but Defendant reports she is "everything to him." *Id.* ¶ 60. Malia Watson is enrolled in school and is essentially healthy, but has poor eyesight. *Id.*

4

b.   Defendant's Physical Condition, History of Substance Abuse

Defendant has had severe vision problems since childhood. *Id*. ¶ 65.  At age ten, he was diagnosed with glaucoma and high myopia, a degenerative eye condition that leads to chronic eye disorders and vision difficulties. *Id*.  Defendant has had several retina detachments that required surgery and retinal implants in both eyes. *Id*. ¶ 66.  He also has tubes in both eyes to relieve the pressure for the glaucoma. *Id.*  Since his arrest, Defendant has had two laser eye surgeries and he reports "he has an elastic band to hold his right eye in place." *Id*.  Defendant reports he is legally blind. *Id*.  However, the New York State Department of Motor Vehicles indicates Defendant has a valid driver's license, which expires on September 12, 2025 and he was operating a motor vehicle at the time of the instant offense. *Id*.  ¶ 68.

Defendant reported having difficulty seeing at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. *Id.*  He reported suffering from constant headaches, but cannot take most medications because of his glaucoma. *Id.*  Defendant's New York Eye and Ear Hospital medical records were reviewed by Dr. Andrew P. Schwartz, M.D., Director of Refractive Surgery and Laser Vision Correction at 5th Avenue Eye Associates. *Id.* ¶ 69.  Based solely on his review of those records, Dr. Schwartz believed Defendant suffered from "severe visual impairment, to include degenerative myopia, glaucoma, refractive amblyopia, myopic degeneration, and retinal detachment." *Id.*  Dr. Schwartz further believed Defendant's left eye provides little functional vision, and Defendant's right eye has functional vision, but with severe limitations in peripheral vision. *Id.*  Dr. Schwartz commented he believes that Defendant is legally blind in both eyes. *Id.*  However, Dr. Schwartz also noted Defendant's vision in his right eye permits him to do things such as "recognize persons, identify a car, and recognize

5

movement." *Id.*  Dr. Schwartz's review of the video evidence in this case further supported his belief that Defendant does, in fact, have functional vision.  *Id.*

Defendant was shot in the left hand during the instant offense and was treated at Kingsbrook Jewish Medical Center, in Brooklyn, New York.  *Id.* ¶ 70.  In his interview with Probation, he noted his hand felt numb, he was unable to rotate it, and he was also unable to carry anything with weight.  *Id.*  Defendant visited the medical center for a follow-up visit post-surgery during which he stated that pain was minimal and reported slight numbness.  *Id.*  On May 14, 2019, Defendant again visited the medical center and at that time, denied pain, numbness, and tingling sensations in his wrist.  *Id*. ¶ 71.  Although x-rays showed bullet fragments overlaying Defendant's left wrist, no acute fracture or dislocation was noted.  *Id.*  Defendant's May 2019 medical records indicate Defendant was prescribed the following medications: "Acetazolamide (used to treat glaucoma); Atropine (eye drops used to treat uveitis and early amblyopia); Brimonidine (used to treat open-angle glaucoma or ocular hypertension); Difluprednate (used to treat an eye condition called endogenous anterior uveitis); Dorzolamide (used to treat pressure in the eyes); and Latanoprost (used to treat pressure in the eyes)." *Id*.  ¶ 72.  According to Bureau of Prisons SENTRY database, Defendant has been taken to the hospital by MDC staff on multiple occasions.  *Id.*

Defendant reports he rarely drinks, but he smoked up to four marijuana cigarettes daily, often to ease headaches, prior to his instant arrest.  *Id.* ¶ 74–75.  Defendant stated his usage increased in 2012 to relieve the pain from eye surgery.  *Id.* ¶ 75.  Defendant has never undergone any drug treatment.  *Id.* ¶ 77.

    c.   <u>Legal History, Nature of Offense</u>

Following a jury trial on July 17, 2019, Defendant was found guilty of three counts.  *Id*. ¶ 1.  Count 1 charges that on December 8, 2018, Defendant attempted to kill an officer and employee of an agency of the United States Government, specifically, a special agent of the Federal Bureau of Investigation (FBI), while such officer and employee was engaged in and on account of the performance of official duties, in violation of 18 U.S.C. § 1114(3) and 18 U.S.C. § 1113.  *Id*.  Count 2 charges that on December 8, 2018, Defendant forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with a person designated in 18 U.S.C. § 1114, specifically, a special agent of the FBI, while such officer and employee was engaged in and on account of the performance of official duties, and such act involved physical contact with the victim, the intent to commit another felony, the use of a deadly and dangerous weapon, and the infliction of bodily harm, in violation of 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 111(b).  *Id. ¶* 2. Count 3 charges that December 8, 2018, Defendant used and carried one or more firearms during and in relation to one or more crimes of violence, specifically, the crimes charged in Counts 1 and 2, and possessed said firearms in furtherance of such crimes of violence, one or more of which firearms were discharged, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and 18 U.S.C. §§ 924(c)(1)(A)(iii).  *Id. ¶* 3.

On December 8, 2018, Federal Bureau of Investigation ("FBI") Special Agent Christopher Harper was on duty in the Canarsie section of Brooklyn, New York.  *Id. ¶* 6.  Agent Harper was in an unmarked Nissan Maxima parked on a one-way street near 1626 Canarsie Road, Brooklyn, New York, Defendant's then residence.  *Id.*  As Agent Harper sat in his parked car, a BMW sedan ("sedan") driven by Defendant approached him, driving the wrong direction down Canarsie Road.  *Id. ¶* 7.  Defendant parked his car near the front of Agent Harper's car, partially obstructing Agent Harper's ability to drive forward.  *Id.*  Defendant then exited his car

and approached Agent Harper's driver side door with one hand inside the front pocket of his hooded sweatshirt. *Id.* Agent Harper saw the Defendant grasp something in the front pocket of his hooded sweatshirt, which Agent Harper believed to be a firearm. *Id.* As a result, Agent Harper began to maneuver his car around the sedan to create distance between himself and the Defendant. *Id.* As Agent Harper drove away, Defendant pulled out a firearm and fired at Agent Harper. *Id.* Defendant fired multiple rounds and one struck Agent Harper in the back. *Id.* Agent Harper exited his car and returned fire. *Id.* Defendant fled the scene in his sedan. *Id.*

Agent Harper returned to his car and called 911 for assistance. *Id.* An ambulance transported Agent Harper to Kings County Medical Center in Brooklyn, New York, where the attending trauma surgeon conducted emergency surgery to treat Agent Harper's wounds, including a collapsed lung, fractured scapula, and a broken rib. *Id.* ¶ 8. But for medical intervention, Agent Harper's wounds would have been fatal. *Id.*

After Defendant left the scene, with a gunshot wound to his left hand, he drove to an auto body shop located on Remsen Avenue in Brooklyn, New York. *Id.* ¶ 9. After appearing to look for something inside his vehicle, and after talking to various persons at the shop and on his cellular telephone, Defendant's friend drove him to Kingsbrook Jewish Medical Center in Brooklyn, New York, in a different car. *Id.* The New York City Police Department ("NYPD") officers responded to the hospital and interviewed Defendant, who claimed he was the victim, as opposed to the perpetrator, in a shooting. *Id.*

That same night, an FBI special agent and an FBI Task Force Officer arrived at the hospital and arrested Defendant for the attempted murder of Agent Harper. *Id.* ¶ 10. When questioned about the incident, Defendant claimed someone suddenly started shooting at him, unprovoked and that he did not fire back, as he did not have a weapon at the time. *Id.* However,

multiple videos and other evidence showed the true progression of events, and Defendant was convicted by a jury on the three counts brought against him in the Indictment.  *Id.*

Furthermore, a search of Defendant's residence revealed approximately 1.5 pounds of marijuana, $15,000 in cash, firearms accessories (firearm holster and firearm maintenance equipment), and large amounts of jewelry in Defendant's bedroom.  *Id. ¶* 12.  The weapon used in the instant offense was not recovered.  *Id.*  The search and investigation also revealed Defendant is a member of the Crips street gang, as indicated by Crips-associated paraphernalia and photographs.  *Id.*  Additionally, persons familiar with Defendant, including Ms. Gangapersad, informed the investigating officers that Defendant was a long-time member of the Crips.  *Id.*

Defendant has been incarcerated at the MDC in Brooklyn, New York, since December 9, 2018.  PSR ¶ 62.  The Bureau of Prisons SENTRY "database indicates that the defendant completed the following educational courses: resume management; violence alternative; and alternative to drug dealing."  *Id.*  Defendant also received a single disciplinary infraction for Possessing a Dangerous Weapon on June 4, 2019, and was sanctioned with 45 days in disciplinary segregation and lost 90 days of commissary and email privileges.  *Id.*  Defendant has had no work assignments since his instant arrest, and the database indicates that he is not medically cleared to work.  *Id.*

### B.  The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The instant sentence adequately punishes the Defendant for his crime and provides both general and specific deterrence. Defendant, unprovoked, attempted to shoot and kill FBI Agent Harper who was driving away from him. PSR ¶ 11. And Defendant did, in fact, strike Agent Harper in the back, causing injuries so severe that Agent Harper would have died without medical intervention. *Id.* ¶ 8. This sentence will deter others from engaging in similar conduct, and justly punishes Defendant for the severity of his actions.

### C.  The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Statutory provisions regarding terms of custody for Defendant's violations of law are as follows. For Count One, Defendant faces a maximum term of imprisonment of twenty (20) years. 18 U.S.C. § 1114(3) and 18 U.S.C. § 1113. For Count Two, the maximum term of imprisonment is twenty (20) years. 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 111(b). For Count Three, the minimum term of imprisonment is ten (10) years and the maximum term is life. 18 U.S.C. § 924(c)(1)(A)(i) and 18 U.S.C. § 924(c)(1)(A)(iii). The term of imprisonment for Count Three must be imposed consecutively to any other counts. 18 U.S.C. § 924(c)(1)(A)(iii).

The parties do not dispute the statutory options for supervised release. For Count One, the Court may impose a maximum term of three years. 18 U.S.C. § 3583(b)(2). For Count Two, the Court may impose a maximum term of three years. 18 U.S.C. § 3583(b)(2). For Count Three, the Court may impose a maximum term of five years. 18 U.S.C. § 3583(b)(2). Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

Additionally, Defendant faces a maximum fine of $250,000.00 per count pursuant to 18 USC. §3571(b) and a mandatory special assessment of $100.00 per count pursuant to 18 U.S.C. § 3013.  The Court may order restitution be paid to any victim of the offense pursuant to 18 U.S.C. § 3663(a)(1)(A).

### D.  The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  18 U.S.C. § 3553(a)(4)(A

#### i.  Count One

For Count One, the parties agree the most appropriate guideline for a violation of 18 U.S.C. § 1114(3) is U.S.S.G. § 2A2.1.  However, the parties dispute the applicability of U.S.S.G. § 2A2.1(a)(1).  Specifically, Defendant argues the Court should apply the base offense level for attempted second-degree murder, resulting in a base offense level of 27, whereas the Government and Probation argue the Court should apply the base offense level for attempted first-degree murder, resulting in a base offense level of 33.  *See* U.S.S.G. § 2A2.1(a), cmt. n.1. The Court addresses each argument in turn.

U.S.S.G. § 2A2.1 defines "first degree murder" as conduct that would constitute first degree murder under 18 U.S.C. § 1111.  Pursuant to 18 U.S.C. § 1111, "murder is the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree."  At trial, the Government proved beyond a reasonable doubt Defendant acted with the requisite malice aforethought.   *See* Gov't Resp. to Def.'s Objs. To PSR ("Gov't Resp.")

11

at 2, ECF No. 177. Accordingly, whether Defendant committed attempted first-degree murder for the purposes of the Guidelines calculation depends on whether he acted with premeditation.

Premeditation requires a showing that a defendant acted with "a 'cool mind' that is capable of reflection," and "did, in fact, reflect, at least for a short period of time before his act of killing." *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983). "In contrast to malice aforethought, premeditation requires that 'an appreciable time elapse between formation of the design and the [attempted] fatal act within which there is, in fact, deliberation.'" *United States v. Delaney*, 717 F.3d 553, 556 (7th Cir. 2013) (quoting *Fisher v. United States*, 328 U.S. 463, 469 n.3 (1946)). Furthermore, "[f]indings of fact for sentencing purposes need only be found by a preponderance of the evidence." *United States v. Herbert*, 813 F.3d 551, 560 (5th Cir. 2015) (*quoting States v. Simpson*, 741 F.3d 539, 556 (5th Cir. 2014)). "[C]ourts can engage in judicial factfinding where the defendant's sentence ultimately falls within the statutory maximum term." *Herbert*, 813 F.3d at 564. Here, the Court is within its discretion to determine the applicable base offense level because a finding that Defendant's actions were premeditated would neither increase the statutory maximum nor increase the statutory minimum term of imprisonment. *See Powell v. United States of America*, 09-CV-2141, 2014 WL 5092762, at *2 (D. Conn. Oct. 10, 2014) (Burns, J.)

Defendant argues "[t]he totality of this evidence does not establish by a preponderance that Mr. Watson shot Agent Harper with premeditation." Def. Mem. at 10. Instead, it shows "Mr. Watson shot his weapon reactively, without the time or opportunity to deliberate whether he was going to kill the car's driver." *Id*. To support this claim, Defendant points to the interplay between his "childhood trauma, severe visual disability, and later trauma as an adult" and the unique circumstances of the offense. *Id*. at 4.

12

Throughout his life, Defendant has dealt with a disabling vision impairment and has been a victim of serious violence and abuse.  As a child, Defendant was physically and sexually abused, and witnessed horrific violence both when living in Guyana and in the United States.  *Id.* at 5–6.  As an adult, that violence continued.  Defendant reports that in 2015, he and his friends were robbed at gunpoint in a gas station.  *Id.* at 9.  Several weeks later, armed gunmen tied up Defendant's stepfather and attempted to rob his home before Defendant and his friends intervened.  *Id.*  Furthermore, Defendant argues his severe visual disability has negatively affected his ability to learn, acquire employment, and interact with others.  *Id.*  Defendant argues that these experiences show that on the day that he shot Agent Harper, his conduct "was the result of a posttraumatic reaction to a misperceived threat."  *Id.*

Defendant claims "how and what [Mr. Watson] did prior to the [shooting]," was not "so particular and exacting that [he] must have intentionally [acted] according to a preconceived design" as is required to find premeditation.  *United States v. Cespedes*, 11-CR-1032, 2015 WL 4597539, at *3 (S.D.N.Y. July 30, 2015) (Engelmayer, J.) (*quoting United States v. Blue Thunder*, 604 F.3d 550, 553 (8th Cir. 1979)).  He maintains that although Defendant had a firearm when he approached Agent Harper's vehicle, it was not in his hand and he was not brandishing it, meaning that he did not approach the vehicle planning to shoot.  *Id.* at 10.  His "reaction and decision to fire his weapon" at Agent Harper's car as it started to drive away was a "spontaneous reaction, rather than the product of deliberation."  *Id.*  at 4.  Defendant reasons that not knowing who owned the vehicle idling near his home, and unable to see through the windows, he reacted fearfully based on his previous experiences of violence and abuse.  *Id.* at 4.

In contrast, the Government and Probation maintain the evidence at trial clearly established Defendant "acted willfully, deliberately, maliciously, and with premeditation."

Gov't Resp. at 2.  They note premeditation "does not require the lapse of days or hours, or even minutes." *United States v. Brown*, 518 F.2d 821, 826 (7th Cir. 1975); *United States v. Cespedes*, 2015 WL 4597539, at *3–4.  Rather, "it is the fact of deliberation, of second thought that is important." *United States v. Catalan-Roman*, 585 F.3d 453, 474 (1st Cir. 2009); *Cespedes*, 2015 WL 4597539, at *3.  They argue "[p]remeditation can be proven by circumstantial evidence, including facts about what the defendant did prior to the actual killing that show he was engaged in activity directed toward the killing, and facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design."  Gov't Resp. at 2;  *Cespedes*, 2015 WL 4597539 at *3.  The Government and Probation claim that a review of "Defendant's actions clearly establish premeditation."  *Id*. at 2.

Defendant was at a nearby barbershop when Ms. Gangapersad called him to tell him there was a car parked outside their home.  *Id*. at 2.  Defendant left the barbershop, got into his car with an illegal firearm in his possession, intentionally drove the wrong way down Canarsie Road, and then parked his car in a manner that partially blocked Agent Harper's from leaving. *Id*.  Defendant had his illegal firearm hidden as he approached Agent Harper's vehicle.  *Id*.  Only when Agent Harper began to drive away—thereby mitigating any immediate threat—did Defendant pull out his gun and fire into the back of the retreating Federal Agent Harper.  *Id*. According to the Government and Probation, this means Defendant made a series of deliberate choices, including the near fatal choice to fire his weapon at Agent Harper.  *Id*.  They argue Defendant could have acted differently: "he could have chosen not to bring a gun to his interaction with Agent Harper; he could have chosen not to box Agent Harper in with his car; he could have chosen not to approach Agent Harper with a firearm; and he certainly could have

14

chosen not to brandish and fire his weapon multiple times." *Id*. at 3.  This evidence establishes Defendant had "ample time and opportunity for deliberation and premeditation before opening fire on Agent Harper.  *Id.*  Thus, they conclude "the Court should reject the defendant's claim that his actions were spontaneous."  *Id.*

The Court has carefully considered the arguments and evidence presented by all the parties.  It finds by a preponderance of the evidence and more, Defendant's actions were clearly and unambiguously premeditated.  Thus, the appropriate base offense level is 33.

Regarding adjustments for Count One, the parties agree the victim sustained permanent or life-threatening bodily injury—the victim suffered a collapsed lung, fractured scapula, and a broken rib.  PSR ¶ 22.  But for medical intervention, the victim's wounds would have been fatal. *Id*.  This justifies an increase by 4 levels under U.S.S.G. § 2A2.1(b)(1)(A).  *Id.*  Therefore, the total offense level for Count One is 37.

   *ii.   Count Two*

For Count Two, the parties agree the most appropriate guideline for a violation of 18 U.S.C. § 111(a)(1) is U.S.S.G. § 2A2.2, which provides a base offense level of 14.  U.S.S.G. § 2A2.2.  Since a firearm was discharged, 3 levels are added per U.S.S.G. § 2A2.2(b)(2)(A). Pursuant to U.S.S.G. § 2A2.2(b)(3)(B), the offense level is increased by 7 because the victim sustained permanent or life-threatening bodily injury, and but for medical intervention, the victim's wounds would have been fatal.  Since Defendant was convicted under 18 U.S.C. § 111(b), the offense level is increased by 2 under U.S.S.G. § 2A2.2(b)(7).  Therefore, the resulting offense level for Count Two is 26.

   *iii.   Count Three.*

For Count Three, the parties agree the correct guideline for a violation of 18 U.S.C. § 924(c)(1)(A)(i) and 18 U.S.C. § 924(c)(1)(A)(iii) is U.S.S.G. § 2K2.4.  The guideline sentence is the term of imprisonment required by statute. Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) shall not apply to this count of conviction.  U.S.S.G. § 2K2.4(b).

Finally, as of completion of the presentence investigation, Defendant had not clearly demonstrated acceptance of responsibility for the offense and so is not eligible for a corresponding reduction in his offense level.  *See* U.S.S.G. §3E1.1.  Defendant does not contest this directly, but does claim that Defendant "was prepared to accept responsibility for shooting Agent Harper and plead guilty to the indictment, provided there was some limit or at least agreed-upon recommendation on the maximum sentence he would receive."  Def. Mem. at 15.  Because the Government "refused to consider any offer," Defendant asks the Court to consider a downward variance instead.  *Id*.

### iv.  Multiple Count Adjustment

Counts One and Two are grouped for guideline calculation purposes because they involve the same victim and the same act or transaction pursuant to U.S.S.G. § 3D1.2(a); PSR ¶ 35.  Count Three cannot be grouped with Counts One and Two.  *See* Application Note 5 to U.S.S.G. § 2K2.4.  Units are assigned pursuant to U.S.S.G. §3D1.4(a), (b) and (c).  One unit is assigned to the group with the highest offense level.  Here, Count One at 37, is the highest offense level.  One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious.  One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level.  Any groups that are 9 or more levels less serious than the group with the highest

offense level are disregarded.  In the instant case, 37, from the grouping of Counts One and Two, is more than 9 levels than Count Three's level of 0, and thus, this yields a total of one (1) unit.

The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at U.S.S.G. §3D1.4.  The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at U.S.S.G. §3D1.4.  Here, there is no adjustment when the unit is equal to one (1).  Accordingly, this results in a combined adjusted offense level of 37, or the offense level for Count One according to the Government and Probation.

 *v.  Sentencing Guidelines Calculations*

All parties agree to a Criminal History Category of I.  PSR ¶ 44; Def. Mem. at 1; Gov't Mem at 4.  Based on an adjusted offense level of 37 and a Criminal History Category of I, the Probation Department calculated the applicable Guidelines range of imprisonment for Counts One and Two as 210 to 262 months.  PSR ¶ 93.  Because there is a mandatory consecutive 120-month sentence for Count Three, this results in a combined adjusted advisory Guidelines range of 330 to 382 months of imprisonment.  *Id*.

Because Defendant maintains he did not act with premeditation, he argues the correct adjusted offense level is 31.  Def. Mem. at 11.  Accordingly, Counts One and Two yield a recommended Guidelines range of 108 to 135 months in Criminal History Category I.  *Id.*  With the mandatory ten-year consecutive sentence for the § 924(c) violation in Count Three, Defendant's recommended guidelines range is 228 to 255 months of imprisonment.  *Id.*

 **E.  Pertinent Policy Statement(s) of the Sentencing Commission**

The fifth § 3553(a) factor, requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission," 18 U.S.C. § 3553(a)(5). The following factors may warrant departure from the sentencing guidelines.

      *i.   Additional Criminal Conduct*

Authorities seized approximately 1.5 pounds of marijuana, $15,000.00 in cash, and firearms accessories from Defendant's bedroom. PSR ¶ 109. Probation notes, and the Government does not dispute, that this indicates additional criminal conduct that could not be factored into Defendant's guideline calculation. *Id.* Pursuant to U.S.S.G. § 5K2.0, it could be considered additional criminal conduct and worthy of sentencing consideration.

Defendant objects to the claim that the items seized from Defendant's home may merit an upward departure. Def. Mem. at 3. Defendant argues the Government introduced the firearm accessories as evidence at trial to support the contention that possessed a gun in connection with a crime of violence. *Id.* Thus, they were fully accounted for in the Guidelines calculation. *Id.* Additionally, Defendant argues that even assuming the government could prove that Defendant unlawfully possessed the marijuana, that offense conduct would not alter his guidelines range since the quantity of marijuana would have qualified Defendant for the lowest offense level under the Guidelines drug quantity table, *see* U.S.S.G. § 2D1.1(17), and would be disregarded

from his total offense level under the guidelines' grouping rules, *see id*. § 3D1.4(c), in light of the severity of the range imposed on the other counts of conviction.  *Id.*

Finally, Defendant notes "possession of cash is not a crime and, to the extent the PSR suggests it is evidence of marijuana trafficking, the amount is too small to warrant an upward departure from the dramatically higher guidelines range Mr. Watson already faces."  *Id.*

ii.   *The Defendant's Vision Condition*

Probation notes that pursuant to Guideline § 5H1.4, "physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  PSR ¶ 111.  Defendant has a diagnosed vision condition, which has left him legally blind.  *Id.*  Defendant has had constant vision problems since age three and at age ten was diagnosed with glaucoma and high myopia.  *Id.*  ¶ 65.  In his adult life, Defendant continues to have severe issues which have required multiple surgeries.  *Id.* ¶ 66.

Defendant argues his disability will result in a uniquely harsh prison environment.

He is unable to participate in much of the programming that is offered because his limited vision prevents him from reading. He also will have trouble moving about a prison facility on his own, especially as his vision decreases. This will limit what he can do while in custody, including participating in recreation, employment, education, training, and other reentry services. It will make the experience of imprisonment feel longer and more punishing than for the average inmate.

Def. Mem. at 13.  Accordingly, Defendant argues this condition warrants a downward departure.

iii.   *Conditions of Confinement and Medical Care*

Defendant further argues that a variance is "warranted based upon the abject conditions of confinement Mr. Watson has faced at the MDC for the past two-and-a-half years, and the

challenges he will face in prison due to his visual disability." Def. Mem. at 11. Defendant has

been detained at the MDC since his arrest on December 8, 2018. *Id.* Since his incarceration, the

MDC has: (1) experienced a weeklong blackout, during which the jail lost heat and power; (2)

imposed strict conditions akin to solitary confinement to stop the spread of COVID-19; and (3)

cancelled all social visitations until recently, depriving Defendant the company of his family and

11-year-old daughter. *Id.* 10–12. Additionally, like many federal inmates, Defendant contracted

COVID-19. *Id.* Defendant argues these are "deprivations that far exceed the normal loss of

liberty inherent in pretrial detention" and warrant the Court's consideration of a downward

departure, citing several recent sentencing decisions from both the Eastern and Southern Districts

of New York. *Id.*

   *iv.  Sentencing Recommendations*

  Based on this analysis, the Government recommends a term of imprisonment of 382

months or greater. Gov't Mem. at 1. They argue Defendant's "violent and outrageous attack on

a law enforcement officer must be met with an equally serious punishment" and that such a

sentence is sufficient but not greater than necessary to reflect the nature and circumstances of the

offense and the history and characteristics of the defendant, to reflect the seriousness of the

offense, to promote respect for the law, to provide just punishment for the offense, and to afford

adequate deterrence to criminal conduct . . . ." Gov't Mem. at 2.

  Probation recommends a sentence of 300 months plus three (3) years of supervised

release with special conditions. U.S. Probation Sentencing Recommendation ("P. Sent. Rec.") at

1–3, ECF No. 157-1. This sentence consists of 180 months for Counts One and Two, served

concurrently in addition to the ten-year mandatory minimum for Count Three served

consecutively. *Id.* Probation stated that Defendant's offense "involved extremely serious

conduct, and the defendant's conduct has permanently scarred the victim . . . ."  *Id*.  However,

Probation "believes some consideration should be given for the defendant's difficult childhood

and health ailments.  As such, based on the history and characteristics of the defendant, and the

nature and circumstances of the instant offense . . . we are recommending a combined total

sentence of 25 years custody."  *Id*.

Defendant requests a sentence of "no more than 180 months—or approximately 80% of

the bottom of the guidelines," arguing this "would be sufficient to achieve the ends of

sentencing, given the unique set of mitigating factors in this case."  Def. Mem. at 1.

### F.  The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  18 U.S.C. § 3553(a)(6).  For the reasons stated in this Memorandum and

Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted

sentence disparities.

### G.  The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide

restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).  According to Probation,

"Since the instant offense occurred after April 24, 1996, restitution is mandatory for Counts 1

and 2 pursuant to 18 U.S.C. § 3663A and Guideline 5E1.1(a)(1).  However, to date, an Affidavit

of Loss has yet to be received from the victim.  As such, restitution cannot be determined with

accuracy."  P. Sent. Rec. at 3.  However, pursuant to 18 U.S.C. § 3664(d)(5), the Court may hold

an evidentiary hearing within 90 days after sentencing to determine the specific amount owed to

the victims.

**CONCLUSION**

Finally, the Court has this to say to Agent Harper and to his family.  In baseball there exists the tradition of the five-tool player: The player who hits, hits with power, runs, fields, and throws.  May I suggest in policing there is a parallel universe: The police officer who patrols, patrols with honor, withdraws from danger, fields threats, and throws down a field of protective fire.  Agent Harper is that five-tool player.  He patrolled under our Constitution.  He patrolled with honor.  When danger approached, he strategically withdrew from that danger to secure public safety.  When he was shot in the back, he fielded that threat, heroically returning fire and preventing the Defendant from harming others by marking his vehicle as the one used in his cowardly and unjustified attempt to murder him.  And finally, he came into this courthouse, looked his assailant in the eye and told the jury precisely what the Defendant had done.  In short, Agent Harper personifies the five-tool officer of the law: the heroic peace officer; the guardian peace officer; the warrior peace officer.

The world now knows the name of a certain murderous former police officer who violated his sacred oath and disgraced his badge in a midwestern state.  And well it should.  Nothing undermines the rule of law more than a criminal cop.  All the world, however, should also know Agent Harper's name as the steadfast embodiment of his fellow peace officers who day after day make our streets safer, our homes more secure, and our Constitution stronger.

In 1863, two years before he created this Court for the Eastern District of New York, President Abraham Lincoln spoke at Gettysburg.  He stated that "in a larger sense, we cannot consecrate, we cannot hallow – this ground.  The brave men, living and dead, who struggled here, have consecrated it, far above our poor power to add or detract.  The world will little note, nor long remember what we say here, but they can never forget what they did here.  It is for us,

the living, rather to be dedicated here to the unfinished work which they who fought here have thus far so nobly advanced."

This Court cannot consecrate nor hallow Special Agent Harper's heroic actions on that day and the days that followed.  But this Court honors him as our five-tool player.  This Court salutes his heroism and his courage under fire.  He is the real deal.  The policeman who personifies the essence of the law, the essence of those wise restraints that make us free.  Agent Harper has our back, and this Court promises to always have his.

For all the above reasons, the Court now sentences Defendant Ronell Watson to 382 months of incarceration to be followed by three (3) years of supervised release with the standard and the special conditions recommended by the Probation Department.  The Court also imposes the special assessment of one hundred dollars per count which the Court is required to impose in all cases.  The Court declines to impose a fine at this time since Defendant appears unable to pay a fine, but the Court reserves the right under law to hold a hearing within the 90-day period under statute should an affidavit of loss be submitted for hearing by the victim.

A sentence of 382 months of imprisonment followed by three (3) years of supervised release is appropriate and comports with the dictates of § 3553.  This sentence is consistent with and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2).  The Court expressly adopts the factual findings of the Presentence Investigation Report and any Addenda to the Presentence Investigation Report, barring any errors contained therein.

**SO ORDERED.**

s/ WFK
_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 16, 2021
      Brooklyn, New York

23